***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner DeLuca with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. Plaintiff began working for defendant-employer on September 23, 1943 and worked until October 25, 1943. Plaintiff's next period of employment began on March 15, 1946 and continued through September 11, 1978. Plaintiff's last period of employment was from April 17, 1979 through October 23, 1979.
2. During the years of plaintiff's employment, defendant-employer employed three or more employees and it and its employees were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. Liberty Mutual Insurance Company provided workers' compensation insurance for defendant-employer and its employees, including plaintiff.
4. Byssinosis is a chronic obstructive pulmonary disease characteristic of and peculiar to employment in the cotton textile industry. Although byssinosis is not an enumerated occupational disease under the provisions of N.C. Gen Stat. § 97-53, employees working in the cotton textile industry in areas where they are exposed to sufficient quantities of respirable cotton dust are at increased risk of developing byssinosis as compared to the members of the public not so exposed, and as such, byssinosis is a compensable occupational disease pursuant to Subpart 13 of N.C. Gen. Stat. § 97-53.
5. Defendant-employer processed cotton during the time of plaintiff's employment. The twister tender and winder tender positions were in areas of the plant where respirable cotton dust was generated.
6. Defendant-employer contends that there are no payroll records regarding plaintiff's employment from which a Form 22 could be prepared. The parties agree that Social Security Earnings Records, and any other information developed regarding plaintiff's earnings at *Page 3 
defendant-employer, and otherwise, may be introduced into evidence by either party, without objection by the other.
7. The following documents were accepted into evidence as stipulated exhibits:
 a. Plaintiff's Form 18B dated May 24, 2003 — Plaintiff's Exhibit No. 1;
 b. Defendant's Form 61 dated November 24, 2003 — Plaintiff's Exhibit No. 2;
 c. Plaintiff's Form 33 dated December 20, 2005 — Plaintiff's Exhibit No. 3;
 d. Defendant's Form 33R dated January 4, 2006 — Plaintiff's Exhibit No. 4;
 e. Medical records from Halifax Medical Specialist — Plaintiff's Exhibit No. 6;
 f. Halifax Regional Medical Center records — Plaintiff's Exhibit No. 7;
 g. Life Care Hospitals of North Carolina records — Plaintiff's Exhibit No. 8;
 h. Raleigh Cardiology and Wake Medical Center records — Plaintiff's Exhibit No. 9;
 i. Employment History Card (2 pages) — Plaintiff's Exhibit No. 10;
 j. Respiratory Questionnaires dated 02/03/77 and 01/13/77 (7 pages) — Plaintiff's Exhibit No. 11;
 k. Cotton dust studies (17 pages) — Plaintiff's Exhibit No. 12;
 l. Employment and Rate Form — Plaintiff's Exhibit No. 13;
 m. Subpoena Duces Tecum served on N.C. Sekaran, M.D., along with records produced by Dr. Sekaran after his deposition, consisting of 27 pages, and marked as Exhibit 14; and *Page 4 
 n. Additional medical records received from Halifax Medical Specialists, Mario Fiorilli, M.D. an internist, and Narayanachar Sekaran, M.D., an internist and specialist in pulmonary medicine, which included records from Frank Fondren, a general medical practitioner, now deceased, consisting of 134 pages, and marked as Exhibit 15.
8. Deposition transcripts of the following were also received, including exhibits identified by the witnesses. All such exhibits are accepted into the record.
 a. Dr. Mario G. Fiorilli;
 b. Dr. Narayanachar Sekaran;
 c. Dr. Daniel Gottovi;
 d. Dr. D. Allen Hayes; and
 e. plaintiff.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born October 26, 1922, and is presently 85 years old. Plaintiff smoked about a pack of cigarettes a day from when she was a teenager until 1998, resulting in at least a 50-pack-year smoking history. Plaintiff also suffers from various medical conditions including Parkinson's disease, heart disease, gastrointestinal problems, fibromyalgia, and osteoarthritis.
2. Plaintiff's first employment in the textile industry began September 23, 1943, when she was hired by defendant-employer into the cloth room. She left work October 25, 1943. *Page 5 
The environment of the cloth room is not known to place employees at an increased risk for the development of byssinosis or obstructive lung disease related to cotton dust exposure and plaintiff does not recall excessive dust in the environment. Plaintiff returned to work in the spooling department on March 15, 1946, as a winder, and then beginning May 24, 1946, started working as a twister tender. She continued to work as a twister tender until being laid off on September 11, 1978. During the years of her work as a twister tender, she also would occasionally work in other parts of the spinning and winding areas of the plant. Plaintiff was laid off as the company was reducing operations and preparing to close the plant.
3. Plaintiff was rehired April 17, 1979, and worked until October 23, 1979, when she was laid off again as the plant reduced operations. Her employment was intermittent and she worked in different portions of the plant, but primarily in the twisting and winding departments. In May 2003, plaintiff filed a claim for workers' compensation benefits. Based on available records her average weekly wage was $159.20.
4. Plaintiff's work area was dusty and linty. The machine she worked on produced dust and lint. She was also required to blow off the machines which caused more dust and lint. When the dust and lint would get into her mouth and nose, it would make her cough. Plaintiff's work environment in the twisting and winding departments were areas producing sufficient quantities of respirable cotton dust to be at risk for the development of cotton dust related obstructive lung disease. No dust masks were used by plaintiff and her fellow employees.
5. Plaintiff's primary care physician at least from 1970, continuing until 1992, was Dr. Frank Fondren. During those same years, plaintiff was hospitalized at Halifax Regional Medical Center, which was earlier known as Roanoke Rapids Hospital, on several occasions. During the 1970s, there is no reference in Dr. Fondren's records to plaintiff having acute or *Page 6 
chronic bronchitis or any kind of lung disease. He did treat her on one occasion for a secondary diagnosis of sinusitis. The hospital records in the 1970s and 1980s do not indicate that plaintiff was ever hospitalized or treated at the hospital for acute or chronic bronchitis or any kind of lung disease. She was seen at the hospital on January 9, 1964 for pain in her chest and the upper part of her stomach and for a sinus infection. The discharge diagnosis was sinusitis and peptic ulcer. In 1966, she was treated for abdominal pain and lumbosacral syndrome; in 1970 for chest and epigastric pain diagnosed as gastritis; in 1971 for an ulcer; in 1978 and 1979 for diverticulosis; and in 1981 for infectious hepatitis. Dr. Fondren's records, and those of Halifax Regional Medical Center contain no reference to prescription medicine for any lung condition.
6. On February 11, 1977, plaintiff completed a Respiratory Questionnaire as part of defendant-employer's Respiratory Monitoring Program at the plant. Plaintiff's responses to interview questions indicated that plaintiff was experiencing respiratory symptoms including shortness of breath, coughing, septum production, and chest tightness. On the Questionnaire, plaintiff reported that she had bronchitis but did not describe on other portions of the questionnaire symptoms consistent with the diagnosis of bronchitis. Plaintiff inaccurately testified that she was variously treated by Dr. Fondren for respiratory infections and asthma and was prescribed medication for such treatment by Dr. Fondren. The medical and hospital records recorded contemporaneously to this time period contradict plaintiff's testimony.
7. On the Questionnaire, plaintiff did not describe any symptoms related to her work in the mill. She did report smoking cigarettes for 30 years averaging more than a pack but less than a pack and a half per day.
8. On October 31, 1977, plaintiff performed pulmonary function tests at the plant, also a part of defendant-employer's Respiratory Surveillance Program. The pulmonary function *Page 7 
test is designed to test the employee on entry into the workplace after being absent over the weekend and then test again six hours later. The purpose of the testing is to identify those employees who might be sensitive to or have a reaction to cotton dust in their work environment.
9. Plaintiff underwent the pulmonary function testing at 7:18 a.m. on October 31, 1977. Plaintiff's forced vital capacity and her FEV-1 (the amount of air expelled in the first second of expiration) were both in excess of 100% of predicted levels. When plaintiff was re-tested six hours into the shift, her results indicated a 7% change in lung function based upon a lower FEV-1 amount.
10. Both Dr. Daniel Gottovi, who testified for plaintiff as a pulmonary expert in textile occupational diseases, and Dr. Allen Hayes, who testified for defendants as a pulmonary expert in textile occupational diseases, agreed that, plaintiff did not demonstrate reactivity on the pulmonary function tests performed. Both also agreed that, on the basis of these tests, plaintiff did not have evidence for obstructive pulmonary disease. Both Dr. Gottovi and Dr. Hayes testified that based upon the respiratory questionnaire and pulmonary function tests, plaintiff did not meet the definitional diagnosis of chronic bronchitis, the condition that may eventually lead to chronic obstructive pulmonary disease (hereinafter "COPD") due to cotton exposure. Dr. Gottovi did opine that the 7% change in plaintiff's FEV-1 level would raise a red flag for him that there may be some early airways obstruction. However, Dr. Hayes opined that he would not consider a 7% change to be a significant decrease in terms of whether or not plaintiff may have had reactions to cotton dust exposure. Dr. Hayes further testified that plaintiff's test results were not even borderline but were solidly normal numbers.
11. Plaintiff did not have COPD, due to cotton dust, or otherwise, when tested in October 1977. Thereafter, plaintiff worked full-time until being laid off on September 11, 1978. *Page 8 
Plaintiff was rehired April 17, 1979 and worked until October 23, 1979. This period of her employment was intermittent and she worked in various areas of the plant. Furthermore, the cotton dust studies identified as Plaintiff's Exhibit #12 show that after 1977, plaintiff's work area in the mill produced levels of respirable cotton dust that were within the permissible exposure levels established by OSHA.
12. Plaintiff had worked in the mill for about 33 years at the time of the tests performed in 1977. Dr. Hayes testified that if plaintiff had been a reactor to the cotton dust environment, she would have developed COPD prior to the time of her tests performed in 1977. Plaintiff was not a reactor to cotton dust and based on the medical records from Dr. Fondren, the medical records from Halifax Hospital, the Respiratory Questionnaire completed by plaintiff in 1977, the pulmonary function test results completed in 1977, and the opinions of Dr. Hayes, plaintiff had not developed any lung condition related to her cotton dust exposure at the time of the testing in 1977.
13. After plaintiff left work with defendant-employer, she filed a claim for Social Security Disability benefits in 1980. Her claim was based on a low back injury that is described in some of the records as a herniated disc or a lumbosacral syndrome. She was treated by Dr. Hardee, a neurosurgeon in Greenville, for problems related to her back.
14. At some time after plaintiff was laid off with defendant-employer, she began work as a nurse's aide. She continued in that employment until approximately 1995, working primarily in private residences.
15. Dr. Mario Fiorilli, a family physician who is board certified in internal medicine, started treating plaintiff in 1992, after Dr. Fondren retired. In his deposition, Dr. Fiorilli reviewed plaintiff's medical records from her treatment with Dr. Fondren during the 1970s and *Page 9 
1980s and found no mention of breathing problems or a diagnoses of either chronic obstructive pulmonary disease or byssinosis. In April 1992, Dr. Fiorilli referred plaintiff to a cardiologist, Dr. Virgil Wynia, whose records document that plaintiff's symptoms included breathing difficulties, chest tightness, chest pain, and dyspnea. Dr. Wynia performed a cardiac catheterization and discharged plaintiff with a diagnosis of non-cardiac chest pain, dyspnea, and probable chronic obstructive pulmonary disaease (hereinafter "COPD").
16. Thereafter, plaintiff had ongoing respiratory symptoms requiring numerous admissions to Halifax Regional Medical Center, and documented COPD. On August 5, 1994, x-rays and a CT scan of plaintiff's chest showed findings compatible with COPD. Plaintiff's history of a chronic cough was documented in March 1995. In July 1999, plaintiff was admitted to the hospital with shortness of breath, underwent a lung ventilation scan that was indicative of COPD, and discharged with a diagnosis of COPD. Plaintiff was admitted to the hospital in February 2000, with severe shortness of breath and diagnosed with fluid retention with a ventricular hypertrophy and pulmonary hypertension superimposed on COPD.
17. On May 5, 2000, plaintiff was again hospitalized with severe shortness of breath. Plaintiff was sent to a pulmonologist, Dr. Narayanachar Sekaran, for an evaluation of her breathing condition. A pulmonary function test was performed on May 8, 2000, which indicated plaintiff had moderately severe COPD, and Dr. Sekaran recommended bronchodilator therapy. Due to plaintiff's persistent respiratory problems, Dr. Sekaran performed a bronchoscopy and levage, and diagnosed plaintiff with acute exacerbation of COPD. In July 2000, plaintiff was again hospitalized with severe shortness of breath and discharged with a diagnosis of COPD. On May 31, 2002, plaintiff's chest x-ray showed evidence of COPD and she was diagnosed with COPD and chronic oxygen dependence. *Page 10 
18. Plaintiff was again admitted to Halifax Regional Medical Center on April 12, 2003, complaining of cough, fluid in her lungs, and shortness of breath. Plaintiff was given aggressive bronchodilator therapy. On May 27, 2003, Dr. Fiorilli diagnosed plaintiff with an acute exacerbation of COPD and byssinosis, in part based upon a purported diagnosis of byssinosis by Dr. Fondren in the 1970s though Dr. Fondren's medical records do not support this. Dr. Sekaran also diagnosed plaintiff with byssinosis, though he failed to take a detailed clinical history.
19. Plaintiff's condition deteriorated to the point that she is severely impaired. Plaintiff is currently confined to her home and essentially bedridden. She normally stays in bed because getting up and walking causes shortness of breath. She requires around-the-clock care, which she receives from one of her friends. She is severely oxygen dependent and has been put on a respirator. Plaintiff's condition is chronic, permanent, and progressive. Plaintiff's prognosis is poor, and she will continue to decline over the years.
20. Dr. Fiorilli opined that plaintiff's COPD is secondary to her exposure to cotton dust and tobacco, and that plaintiff's exposure to cotton dust more likely than not significantly contributed to plaintiff's COPD. However, Dr. Fiorilli testified that he did not know exactly what plaintiff's occupation was for defendant-employer, making an assumption that she worked in an area that exposed her to respirable cotton dust.
21. Dr. Sekaran, who is board certified in pulmonary medicine, opined to a reasonable degree of medical certainty that plaintiff's exposure to cotton dust was a significant contributing factor to the development of COPD. Dr. Sekaran testified that his diagnosis of byssinosis, rather than COPD caused by smoking, is based upon taking a careful clinical history *Page 11 
from the patient. However, he acknowledged that he never took a careful clinical history from plaintiff, even though he opines that plaintiff has byssinosis.
22. Dr. Gottovi opined to a reasonable degree of medical certainty that plaintiff's occupational exposure to cotton dust placed her at an increased risk of developing byssinosis and COPD and that it was a significant contributing factor in the development of her COPD. However, on cross examination, when posed the question of whether COPD can result from exposure years after the exposure ended, Dr. Gottovi agreed that it would be unusual to develop symptoms after the exposure ended.
23. Though Drs. Fiorilli, Sekaran, and Gottovi were asked to provide scientific or medical evidence showing that a person with normal pulmonary function testing near the end of the exposure could nonetheless develop COPD years later as a result of that exposure, none of the three doctors could provide scientific or medical evidence to show that this was a possibility. Nonetheless, all three doctors felt it was possible for a condition such as plaintiff's to have progressed substantially after her exposure to cotton dust ended, despite the fact that near the end of her employment plaintiff did not have a pulmonary condition.
24. In his deposition, Dr. Hayes opined that plaintiff's cotton dust exposure did not represent a significant contributing factor to plaintiff's COPD. He based his opinion on the normal pulmonary function test in 1977, the long lag time between the end of plaintiff's cotton dust exposure in 1979 and the time that COPD was diagnosed in 1992, and plaintiff's long history of smoking. The undersigned give more weight to the testimony and opinions of Dr. Hayes over those of Drs. Fiorilli, Sekaran, and Gottovi.
25. Plaintiff's testimony regarding her symptoms and condition was contradictory, at one point testifying that she had breathing problems during her employment and later testifying *Page 12 
that her breathing problems did not start until years after her employment ceased. Her testimony was also contradicted by her medical records covering the time period she was employed by defendant-employer.
26. Based upon the greater weight of the evidence showing that plaintiff did not suffer from chronic bronchitis or COPD during the time of her exposure to cotton dust, that specifically plaintiff did not suffer from bronchitis or COPD or any type of pulmonary condition in 1977 when she completed the Questionnaire and performed the pulmonary function tests, that plaintiff's pulmonary function tests did not show plaintiff to be a reactor to cotton dust, and based upon the opinion of Dr. Hayes, plaintiff has not shown that she suffers from byssinosis or that her exposure to cotton dust caused or was a significant contributing factor in the development of her current COPD.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In workers' compensation cases, plaintiff has the burden of proving every element of compensability. As part of this burden, plaintiff must present convincing evidence establishing these elements, including, in this case, expert medical testimony. Holley v. ACTS, Inc., 357 N.C. 228,234, 581 S.E.2d 750, 754 (2003).
2. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him or her to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a *Page 13 
significant causal factor in, the disease's development. Hardin v. MotorPanels, Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000) (citingRutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983)).
3. Plaintiff has not proven by the greater weight of the evidence that her employment with defendant-employer caused or significantly contributed to her COPD. N.C. Gen. Stat. § 97-53(13); Rutledge v. TutlexCorp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). Fann v. BurlingtonIndust., 59 N.C.App. 512, 296 S.E.2d 819 (1982); Booker v. Duke MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits is hereby denied.
2. Defendants shall bear the costs, including, if they have not already been paid, an expert witness fee in the amount of $750.00 for Dr. Fiorilli, $750.00 for Dr. Sekaran, $1,000.00 for Dr. Gottovi and $1,000.00 for Dr. Hayes.
This the 8th day of February, 2008.
S/______________________ DIANNE C. SELLERS COMMISSIONER
 CONCURRING: *Page 14 
 S/______________________ BUCK LATTIMORE COMMISSIONER
DISSENTING:
 S/______________________ CHRISTOPHER SCOTT COMMISSIONER *Page 15